## In re B.S., Juvenile

[693 A.2d 716]

No. 96-137

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed March 28, 1997

*Robert Appel*, Defender General, and *William A. Nelson*, Appellate Attorney, Montpelier, for Appellant Mother.

*Charles S. Martin* of *Martin & Associates*, Barre, for Appellant Juvenile.

*Jeffrey L. Amestoy*, Attorney General, Montpelier, and *Michael O. Duane*, Assistant Attorney General, Waterbury, for Appellee SRS.

**Dooley, J.** The mother in this case appeals the termination of her parental rights with respect to her son, B.S., arguing that the family court (1) improperly allowed the Department of Social and Rehabilitation Services (SRS) to recommend the termination of her parental rights in violation of an agreement not to make such a recommendation, and (2) failed to resolve her claims under the Americans with Disabilities Act (ADA) before terminating her parental rights. We affirm.

The mother is a moderately retarded woman with a verbal I.Q. of 75 and a performance I.Q. of 87. She gave birth to her third child, B.S., on December 30, 1993. On the same day, SRS intervened because the mother and the father had been found responsible for physical abuse of their two other children and those children had been removed from their home. SRS initiated a petition alleging B.S. to be a child in need of care or supervision (CHINS) and successfully sought temporary custody of him.

On January 13, 1994, SRS and the parents entered into a written agreement which kept B.S. in SRS custody, but placed him at the Lund Family Center to reside there with the mother. Both parents agreed to accept the extensive and intensive services of the Lund Family Center. On January 31, however, the mother left the Center to be with the father, leaving B.S. at the Center with no arrangements for his care. SRS returned the child to foster care.

At a merits hearing on March 29, 1994, the parties entered into an oral agreement[1] that: (1) the parents would not contest a merits adjudication of CHINS, (2) custody of B.S. would remain with SRS, (3) certain parts of the affidavit of the SRS worker in support of the CHINS petition would be stricken, (4) the family would be enrolled in intensive family-based services at the Baird Center, (5) the disposi-

---

[1] The agreement was never reduced to writing, nor was there a common oral statement of the agreement. We derive the elements of the agreement from the statements of the lawyers for SRS, the mother and B.S.

tion hearing would be held in sixty days,[2] and (6) SRS would not recommend termination of parental rights at the first disposition hearing. The court found CHINS "based upon the agreement of the parties and their admissions," and ordered a disposition hearing to be set in sixty days.

Thereafter, the mother enrolled in the Intensive Family-Based Service Program at the Baird Center to learn parenting skills. The parents were granted, under the supervision of the Baird Program, twenty hours of visitation each week. Despite assistance from a social worker at the Baird Center, the mother made minimal progress in learning parenting skills.

The initial disposition hearing was held on August 31, 1994, substantially beyond the sixty-day time period agreed to in March, due primarily to delays in obtaining SRS's disposition report and a report from the Baird Center. SRS submitted the disposition report to the court on August 29 and, in compliance with the parties' agreement, did not recommend termination of parental rights. Instead, SRS recommended that B.S. remain in the foster home where he had been living for several months. The mother requested placement with B.S.'s paternal great aunt, who resided in New Hampshire. SRS objected to this placement.

In response to the mother's request, the court ordered a continuance of the disposition hearing to allow for a study by the New Hampshire Department of Children and Youth Services of the great aunt's home. The SRS social worker requested, and was granted, permission to file a supplemental disposition report.

By December 1994, it became apparent that the home study by the New Hampshire department would not be ready for several months. At a status conference on December 6, the SRS caseworker indicated that he would be seeking termination of the mother's parental rights. As a result, the mother sought an immediate interim placement for the child with the mother's sister. On January 15, 1995, SRS filed a supplemental disposition report, in which it recommended termination of parental rights. Combined hearings on disposition, the petition to terminate parental rights, and the mother's motion to transfer custody to the mother's sister were held on February 1, April 10, April 13, October 12 and October 13, 1995. In a written order issued

---

[2]The normal time limit for holding a disposition hearing is thirty days. See 33 V.S.A. § 5526(b). The court may order a continuance for a reasonable period to receive reports and other information bearing on disposition. *Id.* § 5527(e).

March 6, 1996, the court denied the mother's motion to transfer custody. Finding that the mother's ability to care for her child had stagnated between August 1994 and October 1995, and that termination of parental rights would be in the best interests of the child, the court granted the State's petition to terminate parental rights and transferred all remaining residual rights to SRS.

The mother's first claim of error is that the court improperly allowed SRS to recommend termination of her parental rights (TPR) in its supplemental disposition report of January 1995 in violation of the oral agreement under which she admitted B.S. was CHINS. She seeks specific performance of the SRS's agreement not to recommend TPR, or in the alternative, an order vacating the CHINS adjudication. SRS responds that it fulfilled the terms of the stipulation because it did not recommend termination at the first disposition hearing held in August 1994. The court concluded that changed circumstances relieved SRS of its obligation not to recommend termination of parental rights.

We need not decide whether SRS violated the agreement between the parties because we agree with the family court that the agreement was subject to modification and could be modified in this case. We have consistently held that agreements involving the interests of children are subject to the overriding supervision of the family court to protect the children's interests. See *Barbour v. Barbour*, 146 Vt. 506, 509, 505 A.2d 1217, 1219 (1986); *White v. White*, 141 Vt. 499, 503, 450 A.2d 1108, 1110 (1982). Thus, we held in *White*:

> A stipulation between husband and wife on matters pertaining to child support merely reflects what the parties have settled on as an arrangement agreeable to them. Its incorporation into a divorce decree indicates that at the time of the decree the trial court found that what the parties had already settled upon was a just and reasonable sum. That judgment, however, does not affect the trial court's later ability to modify its order when such modification is shown to be equitable under the circumstances.

141 Vt. at 503, 450 A.2d at 1110 (citations omitted).

We adopted a similar rule for CHINS proceedings in *In re Neglected Child*, 130 Vt. 525, 296 A.2d 250 (1972), where a parent stipulated to CHINS in return for an agreement that she would retain residual parental rights, but not physical custody. We held that the stipulation could not be given greater stature than a judgment,

which is subject to modification for changed circumstances. *Id.* at 536, 296 A.2d at 257. We conclude that *Neglected Child* applies here in order to protect the continuing interests of the child. The agreement had no greater force than a judgment that adjudicated B.S. as CHINS and limited the disposition for some period. The stipulation was subject to modification for changed circumstances.

The circumstances in this case demonstrate the wisdom of the rule. The March 1994 agreement was based on the expectation that the parents would participate in an intense parenting program and would make progress in learning to parent B.S. If the parents did not improve, the parties contemplated a speedy disposition hearing that could adopt a different case plan. Neither of these expectations was met. Meanwhile, almost a year later, SRS, which by law is required to present an "assessment of the child's medical, psychological, social, educational and vocational needs," 33 V.S.A. § 5527(b)(1), and a proposed disposition and case plan, *id.* § 5527(b)(4), was put in the position of offering a dishonest assessment and recommendation that was not in the best interest of the child if it followed the mother's interpretation of the stipulation.

■ Any disposition order may be "amended, modified, set aside or terminated . . . on the ground that changed circumstances so require in the best interests of the child." 33 V.S.A. § 5532(a). Findings in support of changed circumstances will be affirmed unless they are clearly erroneous. See *In re B.W.*, 162 Vt. 287, 291, 648 A.2d 652, 654 (1994). The conclusion will be affirmed if supported by the findings. See *In re M.M.*, 159 Vt. 517, 522, 621 A.2d 1276, 1279 (1993). We hold that the court's ruling that changed circumstances existed was adequately supported by the findings, particularly in light of the failure of the Baird Center program and the passage of time without progress. The modification to allow SRS to recommend termination, assuming it was necessary, was within the court's discretion.

The mother's second claim of error is that the court improperly terminated her parental rights without addressing her claims under Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131-12134. She relies on the fact that she is mentally retarded and mental retardation is a disability within the meaning of the ADA. See 42 U.S.C. § 12102(2) (defining "disability"); 28 C.F.R. § 35.104(1)(ii) (mental retardation is a disability); *Howard v. Department of Social Welfare*, 163 Vt. 109, 115 n.1, 655 A.2d 1102, 1106 n.1 (1994) (learning disability is impairment under ADA). She argues that, with help, she has the capacity to care for her child and is

therefore a qualified person eligible for accommodation under the ADA. See 42 U.S.C. § 12131(2) (defining "qualified individual with a disability"). She claims that SRS has failed to accommodate her disability and, as a result, has discriminated against her in the provision of the services needed to parent her child.

For purposes of this issue, we will assume most of the mother's argument is correct. Indeed, the family court was highly critical of SRS's conduct towards the parents in this case. The court noted that the parents

> were treated with far less respect and compassion than this court is comfortable with. Through the actions of [the SRS caseworker] and the foster parents, the [parents] were intimidated and ignored during their visitation periods with their child. [The caseworker] failed to adequately respond to concerns raised by counsel for the mother regarding nicknames for the child used by the foster parents in front of the [parents]. [The mother] repeatedly made attempts to obtain approval from [the caseworker] to bring her mother, the child's grandmother, to visit the child. She was forced to tell her mother, a number of times, that she had to check with [the caseworker] to obtain approval. Likewise, a number of requests to take a family photograph . . . were ignored. Although these requests were apparently considered trivial by SRS, they could have been accomplished with little effort and the denial by lack of acknowledgement was demeaning to the [parents].

The issue is not, however, whether SRS properly treated the parents or treated them consistent with the requirements of the ADA. The issue instead is whether SRS's alleged violation of requirements of the ADA may be raised as a defense to a TPR petition. The family court ruled that ADA noncompliance is not a defense. We agree.

We conclude that the ADA does not directly apply to TPR proceedings. The goals of the ADA are "to assure equality of opportunity, full participation, independent living, and economic self-sufficiency" for persons with disabilities. 42 U.S.C. § 12101(a)(8). The act encompasses three areas: employment, public services, and public accommodations offered by private entities. Title II, which deals with public services, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the *services, programs, or*

*activities* of a public entity." *Id.* § 12132 (emphasis added). TPR proceedings are not "services, programs or activities" within the meaning of Title II of the ADA, 42 U.S.C. § 12132. See *Buhl v. Hannigan*, 20 Cal. Rptr. 2d 740, 746 (Ct. App. 1993) (ADA does not apply to law mandating that motorcyclists wear helmets); *Aquaro v. Zoning Bd. of Adjustment*, 673 A.2d 1055, 1061 (Pa. Commw. Ct. 1996) (zoning ordinance does not fall within definition of public "services, programs or activities"). Thus, the anti-discrimination requirement does not directly apply to TPR proceedings.

Even if the ADA applied directly to TPR proceedings, there is no specific discrimination against disabled persons in the TPR process. Mental retardation is not, by itself, a ground for terminating parental rights. In deciding whether to terminate parental rights, the court must determine the best interests of the child in accordance with four criteria set out in 33 V.S.A. § 5540: (1) the interaction and interrelationship of the child with the child's natural parents, foster parents, siblings, and others who may significantly affect the child's best interests, (2) the child's adjustment to home and community, (3) the likelihood the natural parent will be able to resume parental duties within a reasonable period of time, and (4) whether the natural parent has played and continues to play a constructive role in the child's welfare. See *In re J.R.*, 153 Vt. 85, 100, 570 A.2d 154, 161 (1989) (third factor is most important). A mentally retarded parent is capable of meeting these criteria.

Recognizing that the TPR process is not itself discriminatory, the mother argues for an indirect method of considering her disability. The logic of her argument goes as follows: (1) SRS is responsible for providing her services that will enable her to resume her parental duties within a reasonable period of time, (2) SRS failed to do so in a manner that would be effective in light of her retardation, (3) SRS therefore discriminated against her in the extension of services in violation of the ADA, 42 U.S.C. § 12132, and (4) the TPR court cannot conclude that she cannot resume her parenting duties within a reasonable period of time because her parenting deficiencies are caused in whole or in part by SRS. We reject the fourth step in her argument.

■ The primary concern of the family court, when acting as a juvenile court, is to protect the welfare of the child. *In re R.B.*, 152 Vt. 415, 420, 566 A.2d 1310, 1312-13 (1989), *cert. denied sub nom. Appleby v. Young*, 493 U.S. 1086 (1990); see also 33 V.S.A. § 5501. The juvenile court is one of limited jurisdiction, and its jurisdictional grant must be

strictly construed. *In re R.L.*, 163 Vt. 168, 171, 657 A.2d 180, 183 (1995); 4 V.S.A. § 454 (jurisdiction of family court). Thus, we have routinely held that the court cannot consider side issues that do not directly concern the status of the juvenile before it.

A number of relevant decisions explain the purpose and limitations of juvenile proceedings. In *R.B.* we rejected the use of a suppression remedy to protect the rights of the parents because "[u]se of such a remedy would elevate the parent's rights over those of the child to the point where serious damage could be done to the child." 152 Vt. at 423-24, 566 A.2d at 1314. In *In re M.C.P.*, 153 Vt. 275, 571 A.2d 627 (1989), a brother of the juvenile sought the court's intervention to prevent SRS from interviewing him with respect to the parents' abuse of the juvenile. We held that the court had no power to act on this request, explaining "that rigid adherence to the limits on the powers of the juvenile court expressed in the statute is necessary to ensure a singe-minded focus on the juvenile before the court." *Id.* at 303, 571 A.2d at 642. Pursuant to the policy expressed in *R.B.* and *M.C.P.*, we have also held that a parent may not raise violations of requirements of the federal Adoption Assistance Act on parental reunification as defenses to a TPR proceeding. See *In re K.H.*, 154 Vt. 540, 542, 580 A.2d 48, 49 (1990), *cert. denied sub nom. D.H. v. Vermont Dep't of Social & Rehabilitation Servs.*, 498 U.S. 1070 (1991); see also *In re J.S.*, 153 Vt. 365, 370, 571 A.2d 658, 661 (1989) (because of limited jurisdiction of juvenile court, juvenile may not challenge SRS placement decision on ground that process of arriving at it violated provisions of the Adoption Assistance Act).

As in *M.C.P.*, the juvenile court in this case was required to focus on the needs of the child. The Legislature has directed that the juvenile court examine whether the parents will resume parental duties within a reasonable period of time. See 33 V.S.A. § 5540(3). The period of time must be viewed from the perspective of the needs of the child. See *In re J.M.*, 160 Vt. 146, 150, 624 A.2d 362, 364 (1993). The Legislature has not called for an open-ended inquiry into how the parents might respond to alternative SRS services and why those services have not been provided. Such an inquiry ignores the needs of the child and diverts the attention of the court to disputes between SRS and the parents.

We further note that nothing in the ADA suggests that denial of TPR is an appropriate remedy for an ADA violation. Under analogous circumstances, other courts have refused to graft ADA

requirements onto unrelated statutes. See *Buhl*, 20 Cal. Rptr. 2d at 746; *Pack v. Arkansas Valley Correctional Facility*, 894 P.2d 34, 39 (Colo. Ct. App. 1995); *Aquaro*, 673 A.2d at 1061. This is not to say that the mother is without a remedy if SRS has violated the ADA. The ADA provides for a private right of action for Title II violations, 42 U.S.C. § 12133, and its regulations require public entities to adopt and publicize grievance procedures, 28 C.F.R. § 35.107, and outline a federal complaint procedure, *id.* § 35.170. Pursuant to these provisions, the mother could have filed a complaint or brought a civil action to obtain relief.

The mother argues that the existence of a private right of action in the ADA nonetheless entitles her to raise the ADA as a defense. She attempts to distinguish *K.H.*, which holds that violations of the Adoption Assistance Act (AAA) cannot be raised in a TPR proceeding, on the ground that the AAA has no private enforcement mechanism. See 154 Vt. at 542-43 n.2, 580 A.2d at 49 n.2. The mother argues that since the ADA does have a private enforcement remedy, the reasoning of *K.H.* means that the ADA can be raised as a defense to TPR. Her argument would be valid if the remedy, by its terms, extended to a defense to TPR. Because it does not, she is in the identical position of the parent in *K.H.* With no federal remedy, the limited jurisdiction of the family court precludes the relief she seeks. See *id.* at 542, 580 A.2d at 49.

For the above reasons, we conclude that the mother may not raise violations of the ADA as a defense to the TPR proceeding. The two other courts that have considered the question have reached the same result. See *Stone v. Daviess County Div. of Children & Family Servs.*, 656 N.E.2d 824, 830 (Ind. Ct. App. 1995) ("any alleged noncompliance with the ADA . . . [is] a matter separate and distinct from the operation of our [parental] termination statute"); *In re Torrance P.*, 522 N.W.2d 243, 244 (Wis. Ct. App. 1994) ("alleged violation of the ADA is not a basis to attack TPR proceedings"). We are particularly persuaded by the reasoning of *Stone* because it deals with a statutory scheme similar to ours.

By this holding, we do not mean to suggest that parents lack any remedy for SRS's alleged violations of the ADA. We hope that the effect of this decision is to encourage parents and other recipients of SRS services to raise complaints about services vigorously and in a

timely fashion. If that had happened in this case, the complaints could have been acted upon years ago and may have helped to bring about the reunification the parents sought, without holding the interests of the child hostage to disputes between the parents and SRS.

*Affirmed.*