*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SUPREME COURT DOCKET NO. 2014-150

SEPTEMBER TERM, 2014

| | |
|---|---|
| In re B.C.N. and N.C.N., Juveniles | } APPEALED FROM: |
| | } |
| | } Superior Court, Windham Unit, |
| | } Family Division |
| | } |
| | } DOCKET NO. 142/143-11-12 Wmjv |

Trial Judge: Katherine A. Hayes

In the above-entitled cause, the Clerk will enter:

Mother and father appeal termination of their parental rights (TPR) to their children, B.C.N. and N.C.N., born in September 2012 and June 2011, respectively. On appeal, parents argue that the court's finding by clear and convincing evidence that B.C.N. was severely abused was not legally or factually supported, and that the Department for Children and Families (DCF) failed to provide them with reasonable accommodations for their cognitive disabilities. We affirm.

The court found the following facts by clear and convincing evidence. B.C.N. was born prematurely; he had a low birth weight and apnea. Two months after his birth, an early education specialist who was working with the parents saw bruising on B.C.N.'s jaw. Father explained that the injuries resulted from attempting to give the infant artificial respiration the night before when B.C.N. stopped breathing. The following day, on November 29, 2012, B.C.N. was referred by his pediatrician to Dartmouth Hitchcock Medical Center (DHMC), where he was admitted. Doctors did an x-ray scan and discovered B.C.N. had six healing rib fractures. At DHMC, mother stated that she was the one to give B.C.N. artificial respiration. The doctor believed that B.C.N.'s injuries were not accidental and could not have been caused in the way described by parents. Based on the injuries and the doctor's statement that the injuries were not consistent with accident or parents' explanation, the court placed B.C.N. and N.C.N. in DCF custody under an emergency care order.

DCF's initial case plan in March 2013 contained concurrent goals of reunification and adoption. The case plan required parents to, among other things, engage in family time coaching, engage in therapy, and cooperate with service providers. The parents' inability to explain B.C.N.'s severe physical injuries was identified as a major risk factor for reunification. In April 2013, the children were placed with their great aunt and uncle, where they have since remained.

There was a contested proceeding on the merits of DCF's petition to find the children in need of care or supervision (CHINS). Among other witnesses, the State presented testimony concerning the injuries to B.C.N. from B.C.N.'s pediatrician and Dr. Hymel, the director of the child advocacy and protection program at DHMC's children's hospital. The CHINS court found on the record at the close of the hearing that both B.C.N. and N.C.N. were CHINS. The court

found by a preponderance of the evidence that the parents' story, even if believed, showed that they failed to immediately seek medical attention for B.C.N. and that in itself supported a finding that he was CHINS. Further, based on the unexplained injuries to B.C.N. that happened while exclusively in parents' care and parents' apparent untruthfulness in explaining those injuries, the court found parents were not able to care for and protect both children. The court declined the State's request to make findings by clear and convincing evidence, explaining that "while strong inferences can be made that B.C.N. was the victim of child abuse, those inferences are not sufficient at this point to describe exactly what the precise nature of the child abuse was or exactly who was the perpetrator of the child abuse."

At the initial disposition, DCF recommended that parents' rights be terminated. The court held a contested hearing over three days. A transcript of Dr. Hymel's testimony along with his notes and records were admitted at the termination hearing. This testimony included Dr. Hymel's opinion that the bruising on B.C.N.'s jaw and neck and the six healing rib fractures are injuries consistent only with abuse and not accidental causes. Dr. Hymel described that two weeks before B.C.N.'s was admitted based on the jaw bruising, he had a skeletal x-ray based on bruises on his arms that did not have an explanation. No rib fractures were present on that x-ray and the fractures on the November 29 x-rays showed some healing, so Dr. Hymel stated that the injuries must have occurred at least a week before B.C.N. was admitted. He opined that the fractures could not have come from chest compressions for an attempt at artificial respiration the day before, both because of the timing and because children's ribs at that age are flexible and would not fracture from chest compressions. Dr. Hymel testified that the cause of the injuries would require force beyond normal interaction with a baby, such as an adult falling onto him, smashing fist into him, or someone stomping on him. Although Dr. Hymel did not opine that one of these particular events occurred, he offered them as examples of the severity of force required.

At the termination hearing, there was also evidence concerning the parents' visits and progress with respect to the case plan. From December 2012 to July 2013 parents were fairly consistent in attending visits, but they did not make significant progress and visits did not progress to unsupervised, or community or home-based settings. From June to September 2013, parents attended fourteen of thirty-four visits and between September and the beginning of the final hearing in November 2013, father attended six and mother five of eleven scheduled visits.

A DCF investigative caseworker testified that father has a history of delinquency for sexually abusing a younger child. Father also admitted to inappropriate sexual conduct with female relatives. Father did not complete recommended sex-offender treatment.

Two professional evaluations of the parents were completed, and the evaluators testified at the termination hearing. The first was done at DCF's request by Dr. Gabriel. She determined that both parents have some cognitive disabilities, as well as significant psychiatric disabilities that require treatment. She diagnosed father with post-traumatic stress disorder, possible depression and an avoidant personality disorder. She diagnosed mother with major depression and an avoidant personality disorder. She recommended a year of consistent therapy as a precondition to considering returning the children to parents' care. She particularly recommended sex-offender treatment for father. The second evaluation was completed at parents request by Dr. Brisson. She concluded that both parents have language-based disabilities, but they did not have untreated serious mental illnesses. She believed that mother and father were willing and capable of parenting, but need written instructions and simplified language for instruction. She recommended that the parents engage in therapy and receive home-based support.

2

Based on the evidence, the court assessed the best interests of the children. The court concluded that there was clear and convincing evidence that B.C.N. was severely injured while in parents' care and that neither parent had taken responsibility for the injury or provided a credible explanation for the injury's cause. The court further concluded that both parents either know how the injury occurred or have been grossly negligent in caring for B.C.N. The court relied primarily on the opinion of Dr. Hymel concerning the severity of force required to inflict such an injury, and the facts that the parents resided together and were the sole caretakers of B.C.N. at the time of injury.

The court found that parents had not followed through on any of the case-plan goals to a significant degree, including failing to show consistent visits with the children, improved parental connections, engagement in therapy, and sex-offender therapy for father. The court found that DCF made reasonable efforts to assist parents in light of their disabilities. The court's conclusions were not guided significantly by either expert evaluation. The court explained that its decision was based primarily on "the stark facts of [B.C.N.'s] unexplained injuries, and the parents' lack of progress in achieving the reasonable case plan goals." The court found that the children have a loving relationship with their foster parents, who wish to adopt them. They are well-adjusted to their home and community. Although the children enjoy visits with parents, they are not close or bonded to parents and show signs of discomfort and anxiety after visits. The court concluded that parents had not made the necessary progress to enable them to parent within a reasonable period of time and that they did not play a significant role in the children's lives. Both parents appeal the termination decision.

The family court may terminate parental rights at the initial disposition proceeding if the court finds by clear and convincing evidence that termination is in the child's best interests. In re J.T., 166 Vt. 173, 177, 179 (1997). In assessing the child's best interests, the court must consider the statutory criteria. 33 V.S.A. § 5114. The most important factor is whether the parent will be able to resume parenting duties within a reasonable period of time. In re J.B., 167 Vt. 637, 639 (1998) (mem.). The reasonableness of the time period must be measured from the child's perspective, In re B.M., 165 Vt. 331, 337 (1996), and may take account of the child's young age, In re J.S., 168 Vt. 572, 574 (1998) (mem.). On appeal, we will uphold the family court's conclusions if supported by the findings and affirm the findings unless clearly erroneous. In re A.F., 160 Vt. 175, 178 (1993).

On appeal, parents first argue that the court erred in holding that there was clear and convincing evidence that B.C.N. was severely abused by one or both parents. In particular, they argue that the CHINS court specifically found in the merits decision that such abuse had not been established by clear and convincing evidence, that the TPR court relied on essentially the same evidence as presented in the trial court, and that allowing the TPR court to reevaluate the evidence and reach a different conclusion from the CHINS court as to the persuasiveness of the evidence amounts to an impermissible horizontal appeal of the CHINS decision.[*]

_____

[*] Parents argue that the TPR court did not have any new or additional evidence to support its findings, and, in particular, argue that the TPR court could not consider mother's invocation of the Fifth Amendment at the TPR hearing as additional evidence. We need not address this constitutional argument because our decision turns on the consistency between the TPR court's findings and those of the CHINS court, and not on the presence of additional evidence at the TPR hearing concerning the injuries to B.C.N. Moreover, nothing in the TPR court's findings suggests that the court rested its finding on mother's invocation of the Fifth Amendment.

In so arguing, parents misread both the CHINS court's and the TPR court's decisions. The CHINS court did not reach a global conclusion that the evidence could not support a finding by clear and convincing evidence on any of the issues. Instead, the court said that it could not determine with that level of confidence who had abused the child and how: "While strong inferences can be made that B.C.N. was the victim of child abuse, those inferences are not sufficient at this point to describe exactly what the precise nature of the child abuse was or exactly who was the perpetrator of the child abuse." The trial court went on to conclude by a preponderance—the standard the State had to meet in the merits context—that if B.C.N. had in fact experienced apnea, as the parents claimed, albeit with very inconsistent stories initially, the parents' failure under all the circumstances to immediately seek medical attention for the child would itself have been sufficient to satisfy the State's burden. The court went on to conclude that B.C.N.'s severe bruises and injuries, and the parents' mutually contradictory stories explaining them, raised very significant issues about whether the parents could be honest enough with themselves, each other, and DCF to protect N.C.N. Finally, noting the unusual character and severity of B.C.N.'s injury, and the parents' inability to offer a good explanation, and the inconsistency in the explanations that they did offer, the court concluded,

> the court is left with the unmistakable conclusion that this child had some terrible thing happen to him at a time when likely both parents knew what it was but have not been truthful about what it was. This leads to the conclusion that they are not in a good position to take care of that child or his brother.

Although the court made these findings by a preponderance-of-the-evidence standard, the CHINS court did not suggest that the evidence supporting these latter conclusions could not meet the clear-and-convincing-evidence standard. In fact, it described its conclusion on these points as "unmistakable."

For its part, the TPR court did not purport to make a finding about who abused B.C.N., what the nature of the abuse was, or even whether B.C.N. was actually abused by one or both or the parents. Instead, it concluded,

> Here, the evidence clearly shows that [B.C.N.] was severely injured while in his parents' care, and that neither parent has taken responsibility for his injuries or provided any credible explanation for how they occurred. The evidence also clearly shows that both parents either must have known how the injury occurred, or who was responsible for it, or have been grossly negligent in caring for [B.C.N.] if they did not know who was responsible.

At the CHINS merits hearing, it is the State's burden to demonstrate by a preponderance of the evidence that the statutory factors are met. In re J.R., 164 Vt. 267, 270 (1995); see 33 V.S.A. §§ 5315(a) (stating State has burden of establishing facts by preponderance of evidence), 5102(3) (setting forth bases for concluding child is CHINS). Because a decision to terminate parental rights requires proof by clear and convincing evidence, this Court has held that the parties are not barred from relitigating issues that were resolved at the merits hearing by a preponderance of the evidence. In re J.R., 164 Vt. at 270-71.

We need not reach the question of whether a CHINS court's conclusion that evidence of a certain fact does not rise to the level of clear and convincing proof precludes the TPR court from concluding otherwise on the basis of substantially the same evidence. In this case, the TPR

4

did not make contrary findings on the matters with respect to which the CHINS court concluded the evidence was not clear and convincing—the precise nature of the child abuse or exactly who was the perpetrator. Instead, the TPR court concluded by clear and convincing evidence that both parents must have known how the injury occurred, or who was responsible for it, <u>or have been grossly negligent in caring for the child if they did not know who was responsible</u>.

Parents next argue that the evidence does not support the court's finding that DCF made reasonable accommodations to assist parents in light of their cognitive disabilities. Parents contend that they made requests for accommodations due to their cognitive disabilities and that both expert evaluations made recommendations for how DCF could assist parents in learning the requisite parenting skills. Parents acknowledge that the DCF caseworker testified that he used techniques such as providing written instructions and repeating important points, but they claim he did not specifically implement the suggestions made in the expert evaluations. Therefore, parents assert that the court at termination incorrectly found that DCF made reasonable efforts to assist parents.

We emphasize our prior holdings that at termination the best interests of the child are the focus, and the court is not required to make findings regarding whether DCF could have provided alternative services to parents, or whether DCF made reasonable efforts to reunite parents and children. See <u>In re C.P.</u>, 2012 VT 100, ¶ 38, 193 Vt. 29 (explaining that DCF's responsibility to make reasonable efforts to achieve permanency is not a factor at termination); <u>In re B.S.</u>, 166 Vt. 345, 353 (1997) (explaining that court is not required to engage in "open-ended inquiry into how the parents might respond to alternative [DCF] services and why those services have not been provided" because the focus is on the needs of the child). At termination, the court must consider the four statutory factors to determine the children's best interests. See 33 V.S.A. § 5114. The most important factor in the court's analysis is the likelihood that the natural parent will be able to resume his or her parental duties within a reasonable period of time. <u>In re B.M.</u>, 165 Vt. 331, 336 (1996). The level of DCF's assistance to parents is relevant only so far as it influences whether a parent will be able to resume parental duties within a reasonable period of time. <u>In re C.P.</u>, 2012 VT 100, ¶ 38.

Here, the evidence supports the court's finding that DCF made reasonable accommodations to assist parents in light of their cognitive disabilities. Parents' DCF caseworker testified that in response to mother's request for accommodations and father's alternative case plan requesting services under the Vermont Public Accommodations Act, he took several steps. He arranged a team meeting to clarify issues that may have been confusing for parents. He wrote the agenda on the wall so parents could follow the issues. He wrote down phone numbers for therapists and offered to make telephone calls for them. He repeated important points from team meetings, and broke down the case-plan recommendations into steps.

As to implementing the suggestions in the expert reports, the caseworker explained that Dr. Brisson found that parents had only mild impairment and needed questions repeated, and he followed this recommendation. He testified that many of the recommendations in the Brisson report concerning services for parents were unrealistic and therefore not implemented. He explained that the Brisson report did not account for the history of injuries to B.C.N., the length of time the case was already open, or the parents' lack of consistent attendance at visits, which was a necessary precondition before progressing to the in-home parent education. He also expressed that the type of therapy recommended by Brisson was not a good fit because it was too long-term given the children's young age and need for permanency, and required weekly components that were too much given parents' demonstrated an inability to follow through on tasks. He stated that he did suggest to parents, as recommended by Brisson, to engage with

5

parent educators and in individual counseling.  In response to the recommendations made in the Gabriel report, he testified that he took extra care to make sure parents understood requirements and he reviewed matters with them.

Based on this evidence, it was not an abuse of discretion for the court to find that DCF reasonably accommodated parents' disabilities by communicating clearly and effectively the specific actions required.  While parents may disagree with the court's conclusion, they fail to show any abuse of discretion.  In re S.B., 174 Vt. 427, 429 (2002) (mem.) (explaining that it is exclusively role of family court to weigh evidence and to assess credibility of witnesses).  Most importantly, overall, the children's young age, the evidence of parents' inability to parent the child presently, and the unlikelihood they could do so in the near future, support the court's conclusion that termination was in children's best interests.  See In re A.F., 160 Vt. at 178 (conclusions of law will be upheld if findings support them).

Affirmed.

BY THE COURT:

_____
John A. Dooley, Associate Justice

_____
Marilyn S. Skoglund, Associate Justice

_____
Beth Robinson, Associate Justice

6