VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org



Case No.     25-AP-178

*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant. Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

OCTOBER TERM,   2025

In re A.C., Juvenile            }    APPEALED FROM:
(J.C., Father\*)               }
                              }    Superior Court, Chittenden Unit,
                              }    Family Division
                              }    CASE NO. 21-JV-00814
                                  Trial Judge: Kate Gallagher

In the above-entitled cause, the Clerk will enter:

Father appeals from the termination of his residual parental rights in daughter A.C.[1]  We affirm.

The trial court made the following findings in a May 2025 order after a termination hearing.  A.C. was born in September 2019.  In June 2021, the State alleged that A.C. was a child in need of care or supervision (CHINS) due to concerns about substance abuse disorder, domestic violence, unsanitary conditions in the home, lack of supervision, and A.C.'s unmet medical needs.  A.C. was placed in the custody of the Department for Children and Families (DCF) and mother later stipulated that A.C. was CHINS.

The disposition case plan, adopted in February 2022, called for reunification with either parent.  The plan required father to engage in treatment for substance use, mental health, and domestic violence.  He was also required to remain law-abiding, obtain stable housing, engage in parenting classes, and attend shared team meetings.  While father made some initial progress, he continued to use substances and was required to leave at least two housing placements, one because of an altercation.

In December 2022, the State moved to terminate parents' rights.  Shortly thereafter, in January 2023, father was arrested and incarcerated in New Hampshire.  He had supervised phone contact with A.C. during this time but had no in-person contact with her after January 2023.  The court found that A.C. loved and missed parents.  At first, she was excited to hear from father and would ask about him, but her excitement waned as she grew older.  A.C. developed nightmares after video visits with father and the visits were stopped.

---

[1]  Mother's rights were terminated in October 2024, and we affirmed this decision on appeal.  See In re A.C., No. 24-AP-345, 2025 WL 826918 (March 14, 2025) (unpub. mem.), https://www.vermontjudiciary.org/sites/default/files/documents/eo24-345.pdf.

After coming into DCF custody, A.C. was placed with her maternal grandparents. A.C. was strongly bonded to grandparents and her half-brother J.C., who also lived with grandparents. Grandparents also raised several of A.C.'s older siblings. Grandparents could not provide a permanent home for A.C. but were committed to caring for her until a permanent placement was found. Grandparents addressed A.C.'s unmet medical needs and enrolled her in daycare and school. A.C. made tremendous progress in grandparents' care. In January 2025, A.C. was placed with a new foster family. She transitioned well to the home and enjoyed the presence of another child and dog in the home. Because the family lived in the same school district as grandparents, A.C. did not need to change schools or her afterschool activities. The foster family ensured that A.C. maintained contact with grandparents and J.C. A.C. was doing extremely well with the transition; she was happy and "fit right in." She had not mentioned parents since being placed with her new foster family.

Father was released from incarceration in December 2024. He was diagnosed with schizophrenia while incarcerated and lives with a guardian in New Hampshire. Father takes suboxone and he also takes medicine to treat schizophrenia; he began therapy shortly before the termination hearing. Father's guardian assisted father with daily living; he also helped father obtain Social Security benefits and was helping father obtain an apartment. Father had unresolved criminal charges. Father believed he could resume parenting A.C. in several months. While A.C. would have to change schools, father believed that the transition would not be too difficult because she would be living with him. Father did not think there was any reason for A.C. to have been placed in DCF custody. He did not believe parents' drug use had any impact on their parenting and asserted that the family's home was messy only because they had a puppy. Father blamed DCF for failing to provide him the help he needed and for any trauma that A.C. sustained.

Based on these and other findings, the court determined that father stagnated in his ability to parent, which constituted a substantial change in material circumstances. He made only minimal progress in addressing the issues that brought A.C. into DCF custody. He continued to use substances; he lost his housing and had to leave his hotel placement due to aggressive behavior; he did not obtain mental-health counseling, engage in domestic-violence programming, or complete parenting classes. He was arrested and incarcerated. The court recognized that during the approximately five months since father's release from jail, he had been sober, engaged in mental-health treatment, and took medicine to assist with sobriety and to treat his recently diagnosed schizophrenia. These were new behaviors, however, and father was monitored and assisted by his guardian in maintaining his sobriety and mental health. Notwithstanding his mental-health treatment, the court found that father appeared to have no insight into how his actions harmed A.C. or what he would need to do to parent A.C. successfully.

The court concluded that all of the statutory best-interests factors supported termination of father's residual parental rights. While father loved A.C., he spent very little time with her and did not have a strong bond with her. A.C. had been in DCF custody for almost four years at the time of the court's order. While A.C. initially enjoyed her calls with father, she was now uninterested in connecting with him and did not mention him. A.C. was doing well in her new foster placement and the transition had been surprisingly easy for her, in part because she remained in the same school district and continued to have routine visits with grandparents and siblings. The court found that father could not parent A.C. within a reasonable time as measured from A.C.'s perspective. A.C. struggled with trauma and father did not appear to understand how difficult it would be for her to leave the stability she had with her grandparents and siblings in her community. Father had not taken any parenting classes that would prepare him to care for

a child who suffered significant trauma. While father made progress in the months before the termination hearing, he still did not understand why his parenting was insufficient or why A.C. was placed in DCF custody.

The court noted that father also seemed unconcerned about how he would provide for A.C. financially. He simply asserted that returning A.C. to his care was best for her because he was her biological parent. The court determined that father had not played a constructive role in A.C.'s life. His connection with her was limited by his substance use, mental-health struggles, and incarceration. While father had now obtained needed mental-health treatment, had been sober for five months, and obtained housing with the assistance of a guardian, these were new behaviors. The court found father was not ready to be a positive force in A.C.'s life, particularly given his inability to accept responsibility for the decisions he made and the negative impact those decisions had on A.C. The court added that A.C.'s recent phone calls with father suggested that her contact with father was not constructive. The court thus concluded that termination of father's residual parental rights was in A.C.'s best interests. Father appealed.

At the outset, we caution father's counsel against continued use of hyperbole and inflammatory language about DCF and the trial court in her briefs. These include assertions, for example, that the court "threw this family's good fortune out like garbage, making [A.C.] a legal orphan for no reason whatsoever;" the court "blamed [father] for his illness," "ignored [his] recovery," and "considered father a lost cause;" and the court based its decision on bias, stigma, and "rank speculation." "[I]t is vital to the integrity of our adversary legal process that attorneys strive to maintain the highest standards of ethics, civility, and professionalism in the practice of law." In re S.C., 41 Cal. Rptr. 3d 453, 468 (App. 2006) (quotation omitted). Counsel's assertions are not grounded in the evidence; they are inappropriate, unhelpful, and unnecessary to counsel's arguments on appeal. See id. at 468, 475 (explaining that "[w]hile exaggeration may not violate rules of court and standards of review, it is not an effective tool of appellate advocacy" and "[d]isparaging the trial judge is a tactic that is not taken lightly by a reviewing court").

We thus turn to father's arguments. Father first asserts that the court erred in determining that there was a change of circumstances since the initial disposition order. He contends that the court's determination rested on events beyond his control, specifically, the timing of his diagnosis with schizophrenia. Father also wars with certain findings, arguing for example that he does possess insight into his ability to parent A.C. Father also challenges the court's assessment of the statutory best-interests factors, essentially asking this Court to reweigh the evidence. Father maintains that the court's decision is inconsistent with the statutory goals for juvenile proceedings set forth in 33 V.S.A. § 5101(a)(3)-(6).[2]

---

[2] Father also cursorily asserts that the court discriminated against him, construed his schizophrenia as a "behavior" in violation of the Vermont constitution, and invalidly terminated his rights based on father's "failure to adopt the court's bias and admit [his] own (unproven) inadequacy." Putting aside questions of preservation, these arguments are inadequately briefed. See V.R.A.P. 28(a) (explaining that brief must contain concise statement of case and specific claims of error, contentions of appellant, and citations to authorities, statutes and parts of record relied on); Johnson v. Johnson, 158 Vt. 160, 164 n.* (1992) (stating that Court will not address contentions so inadequately briefed as to fail to minimally meet standards of V.R.A.P. 28(a)). They also rely on a mischaracterization of the court's decision. As discussed infra, the court applied the appropriate statutory standard and its decision is supported by its findings and the record. Father also appears to raise an evidentiary challenge for the first time in his reply brief

We apply a well-established standard of review. To modify an existing disposition order, the court must first find "that a change in circumstances requires such action to serve the best interests of the child." 33 V.S.A. § 5113(b). Changed circumstances are "most often found when the parent's ability to care properly for the child has either stagnated or deteriorated." In re M.M., 159 Vt. 517, 521 (1993) (quotation omitted). "A finding that a parent has made some progress does not, however, preclude a finding of changed circumstances." In re B.M., 165 Vt. 331, 336 (1996). If changed circumstances exist, the court next considers if termination of a parent's rights is in a child's best interests using the criteria set forth in 33 V.S.A. § 5114. "The critical factor is whether the natural parent will be able to resume parental duties within a reasonable period of time." Id. As long as the court applied the proper standard, we will not disturb its findings on appeal unless they are clearly erroneous; we will affirm its conclusions if they are supported by the findings. In re G.S., 153 Vt. 651, 652 (1990) (mem.); see also In re S.B., 174 Vt. 427, 429 (2002) (mem.) ("Our role is not to second-guess the family court or to reweigh the evidence, but rather to determine whether the court abused its discretion in terminating mother's parental rights.").

Father has not demonstrated error here. He fails to show that the court's stagnation determination rested on factors beyond his control. See In re S.R., 157 Vt. 417, 421-22 (1991) (stating that "stagnation caused by factors beyond the parents' control could not support termination of parental rights," but rejecting as meritless parents' argument that DCF caused stagnation). As set forth above, the court found that since the disposition order issued in January 2022, father continued to use substances. He lost his housing and was then removed from other housing due to aggressive conduct. He did not obtain mental-health counseling, engage in domestic-violence programming, or complete parenting classes. He did not remain law-abiding and was arrested and incarcerated. He continued to lack insight into how his actions harmed A.C. or what he would need to parent A.C. successfully. He saw no shortcomings in his parenting that led to A.C. being placed in DCF custody and believed that she could easily transition to a new home away from all that she knew. These findings are supported by the record and they support the court's conclusion that father stagnated in his ability to parent. The record does not show that these factors were beyond father's control or that others were to blame for father's failure to comply with multiple case plan goals during the nearly four years that A.C. was in custody. The court recognized that father had made some recent progress but did not find it sufficient to outweigh the other evidence showing stagnation. While father takes a contrary view of the evidence, we do not reweigh the evidence on appeal. In re S.B., 174 Vt. at 429.

The court's findings similarly support its conclusion that termination of father's rights was in A.C.'s best interests. Father again urges us to draw different conclusions from the evidence, which is not our role. We do not reweigh the evidence on appeal. The record supports the court's findings and conclusions. The decision was not based on "rank speculation," as father asserts. The court did not err in finding that A.C.'s contact with father was upsetting or disturbing to her, which was one of numerous findings that formed the basis of the court's best-interests analysis. The court did not base its termination decision on its "disapproval of father's disability income," as father asserts. Finally, we reject father's assertion, based on his view of the evidence, that the court's decision is inconsistent with the statutory goals for juvenile proceedings set forth in 33 V.S.A. § 5101(a)(1)-(6). The court applied the appropriate standard in determining that terminating father's rights was in A.C.'s best interests. See In re J.M., 2015

and we do not address this argument. See Gallipo v. City of Rutland, 2005 VT 83, ¶ 52, 178 Vt. 244 (stating that issues not raised in original brief may not be raised for first time in reply brief).

4

VT 94, ¶ 12, 199 Vt. 627 ("The best interests of the child remains the touchstone and the court's paramount concern in a termination-of-parental-rights proceeding." (quotation omitted)); see also In re B.S., 166 Vt. 345, 352 (1997) ("The primary concern of the family court, when acting as a juvenile court, is to protect the welfare of the child."). While father believes a different outcome was warranted, he fails to show any error.[3]

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
Harold E. Eaton, Jr., Associate Justice

_____
William D. Cohen, Associate Justice

---

[3] Upon review by the Court, the request by Disability Rights Vermont to file an amicus brief is denied, and the State's motion to strike the brief submitted by Disability Rights Vermont is granted.