VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org



Case No.      25-AP-400

*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant.  Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

MAY TERM,   2026

In re H.R. and A.R., Jr., Juveniles
(A.R., Father\*)

} APPEALED FROM:
}
}
} Superior Court, Addison Unit,
} Family Division
} CASE NOS. 22-JV-00733; 22-JV-00732
Trial Judge: Alison S. Arms

In the above-entitled cause, the Clerk will enter:

Father appeals from the termination of his residual parental rights in H.R. and A.R.  We affirm.

H.R. was born in October 2008; A.R. was born in March 2010.  The children lived with mother and father in Texas until 2019.  At that point, father was hospitalized for mental health reasons.  Mother and the children left Texas around 2020 and lived in various states; they eventually moved to Vermont.  Father has not seen the children since 2019.

In May 2022, the children were taken into emergency custody of the Department for Children and Families (DCF).  About five months later, the children were adjudicated as children in need of care or supervision (CHINS).  Father continued to live in Texas.  DCF sent an Interstate Compact on the Placement of Children (ICPC) home study request to Texas.  The request was denied, however, because father did not complete a required background check.

The court adopted a disposition case plan that called for reunification with mother only. The plan contained action steps for father, which included completing a domestic-violence intervention program, articulating the impact his physical aggression and violence had on the children, completing a substance-use assessment by a licensed drug and alcohol counselor and following all recommendations in the assessment, and signing a release to allow DCF to speak to his evaluator.

DCF's first petition to terminate parents' rights was denied.  In August 2025, DCF moved for a second time to terminate parents' rights.  Mother was notified of the termination hearing

but did not attend. The children, father, and their respective attorneys were in attendance. At the close of the hearing, the court concluded that terminating both parents' rights was in the children's best interests.

The court made numerous oral findings, including the following. The children came into DCF custody after mother caused a fire at their home. Shortly before the fire, mother had a physical and verbal altercation with the children. Mother kicked and injured H.R. Mother began burning photographs, repeating that she didn't want to hurt the children. Mother lost control of the fire and it presented a safety hazard. Mother did not try to extinguish the fire; A.R. did so. This was not the first time that the children had to extinguish a fire that exceeded mother's control. Mother was undressed during the altercation and the fire, and she was described by various witnesses as frantic, agitated, and confused.

Mother's erratic behavior began when she moved to Vermont and stopped taking the medicine prescribed for her bipolar disorder. Mother exhibited paranoid and delusional behaviors. The children were essentially fending for themselves in mother's care and both mother's life and the children's home life were unstable. The court made numerous additional findings concerning mother that we do not repeat here.

The court credited the hearing testimony of both children. H.R., who was seventeen years old, testified that she loved living with her brother and foster parents. H.R. described the chaotic living situation with mother and father in Texas. There were often parties and a lot of parental fighting. Father would get aggressive and loud; at times, he would throw things, including when mother made food that he did not like. He drank daily. Father got very angry with H.R. and A.R. over minor things, such as walking in front of the television. He would yell and scream and get in the children's faces. Father disciplined the children with a belt. Father also handcuffed the children together and handcuffed them to their beds. H.R. wanted the court to terminate both parents' rights. She testified that father had not come to visit her in Vermont, she had essentially no contact with him, and that she would not feel safe living with him.

A.R., who was fifteen years old, also testified that he enjoyed living with his foster family. He agreed with H.R.'s description of their home life in Texas, including that father often used handcuffs on the children as discipline and out of anger and aggression. Father also yelled at A.R. and hit him without provocation. A.R. testified that parents drank daily in Texas and that they appeared intoxicated; mother tried to introduce A.R. to marijuana and alcohol. A.R. explained that the family left Texas because father was cheating on mother; father also tried to overdose on what he thought was a painkiller and he was placed in a mental institution. A.R. described the poor quality of life and lack of parental care while in mother's custody. Mother took medicine prescribed to the children, she acted aggressively toward A.R., and her reactions were disproportionate to the circumstances. Mother smoked and drank daily and she did not care if A.R. went to school. A.R. had minimal contact with father. A.R. last saw father when A.R. lived in Texas and he did not want to reunify with father. A.R. did not think mother or father were fit parents and he wanted the court to terminate their parental rights.

The court further found that the children had been living with the same foster family for approximately three years. It credited the testimony of the children's foster parent that the children responded very well to stability, they were flourishing and engaged in school, and their

2

anxiety had decreased.  The foster parents provided structure in the home and testified that the children knew they were loved.

A DCF family services worker described her struggles to communicate with mother.  As of October 2024, mother was not complying with the requirements of the case plan with respect to her mental health.  She did not sign releases to allow DCF to verify that she was receiving mental-health treatment or provide urine samples on a regular basis.  The family services worker observed mother to be under the influence at a meeting in April 2025; mother exhibited concerning behavior and DCF contacted police.  Mother, who had driven to the meeting, was later convicted of a driving-related offense.  Between April 2025 and the date of the termination hearing, mother remained unwilling to engage in the case plan.  She did not take any responsibility for what the children had gone through and the need for DCF involvement.  Visitation between mother and the children declined over time.

Father had very minimal engagement with DCF during the three-and-a-half years the children were in custody.  Although father asked for an ICPC to be considered as a placement for the children, he failed to comply with the ICPC's requirements so that it could be completed.  The children did not want contact with father.  A family services worker called to check in with father and asked him weekly if he wanted to call her.  He never did.  Father did not complete his action steps in the case plan.  He did not engage in domestic violence programming in Texas and there was no objective information that he was sober.  He did not sign releases for any providers in Texas as contemplated by the case plan.  Another family services worker similarly testified that efforts were made to contact father through texts and calls, but he was not responsive.

Based on these and other findings, the court concluded that parents had stagnated in their ability to parent the children.  Parents did not engage in any meaningful way in the court-ordered plan of services summarized in the disposition report.  They could not put their children's needs before their own.  Their minimal participation in services had little impact on the crucial issues that brought the children into custody.

Turning to the best-interests analysis, the court concluded that the statutory factors supported terminating parents' rights.  Parents could not parent the children now or in the reasonably foreseeable future.  They had not and could not presently provide the children with a safe and stable home.  A reasonable time had passed from the children's perspective for parents to improve their parenting skills.  The children had been in DCF custody for three-and-a-half years and would be harmed by any further delay.  Father had minimal contact with the children.  The children's foster family were meeting the children's needs and providing the children with a loving, supportive, and nurturing environment.  The children were thriving in their care.  Parents clearly could not play a constructive role in the children's welfare as parents had insufficiently addressed their own needs, including father's mental health, domestic violence, and substance abuse issues.  Parents had not addressed the trauma the children suffered that brought them into DCF custody.  For these and other reasons, the court concluded that termination of parents' rights was in the children's best interests.  This appeal followed.

Father argues that the court erred in evaluating the statutory best-interests factors.  He maintains that his rights should not have been terminated because the children were in a safe and nurturing environment and they were close to the age of majority.  Father cites 33 V.S.A. § 5101(a)(3) in support of this argument, asserting that the best-interests criteria must be

construed "to preserve the family" absent a need "to protect the child from serious harm or in the interests of public safety." Father asserts that he cared for the children for an extended period of their lives, which created a parental bond, and that it was not his fault that the children were placed in DCF custody. Father suggests that his rights were terminated solely because the ICPC was not completed and he had "inconsistent" contact with the children after 2019.

To modify an existing disposition order, the trial court must find that there has been a substantial change in material circumstances and that termination of parental rights is in a child's best interests. In re B.W., 162 Vt. 287, 291 (1994). To determine a child's best interests, the court must consider four statutory factors. See 33 V.S.A. § 5114. "The critical factor is whether the natural parent will be able to resume parental duties within a reasonable period of time." In re B.M., 165 Vt. 331, 336 (1996); see also In re B.S., 166 Vt. 345, 353 (1997) (explaining that reasonableness of time period for resuming parental responsibilities "must be viewed from the perspective of the needs of the child"). "As long as the court applied the proper standard, we will not disturb its findings [on appeal] unless they are clearly erroneous, and we will affirm its conclusions if they are supported by the findings." In re G.S., 153 Vt. 651, 652 (1990) (mem.). As we have repeatedly emphasized, "[o]ur role is not to second-guess the family court or to reweigh the evidence, but rather to determine whether the court abused its discretion in terminating [father's] parental rights." In re S.B., 174 Vt. 427, 429 (2002) (mem.).

Father fails to show an abuse of discretion here. The trial court applied the appropriate standard in reaching its decision and its decision is supported by the record. As required by statute, the court evaluated the statutory best-interests criteria to determine if termination of father's rights was in the children's best interests. Section 5101, cited by father, does not provide a different standard. That statute provides that "[t]he juvenile judicial proceedings chapters shall be construed in accordance with" various purposes identified in § 5101(a)(1)-(6). While family preservation is one of these purposes, ensuring "safety and timely permanency for children" is the "paramount concern[] in the administration and conduct of [these] proceedings." 33 V.S.A. § 5101(a)(4). The court acted consistently with § 5101 here.

As set forth above, the court found that father had not seen the children since 2019. The children's life with father was chaotic and disturbing. Father had minimal contact with the children while they were in DCF custody. Father did not comply with the action steps in the case plan related to his substance abuse and history of violence, which was reported by the children and others. He did not engage with DCF. He did not take the steps necessary to complete the ICPC home study. The children did not want to be reunited with him and he could not parent them. The fact that the children were doing well in their foster placement does not mean the court was required to deny the termination motion, as father suggests. Instead, it supports the court's finding that the foster home promoted the overriding goal of safety and timely permanency. The court considered the children's relationship with their foster family, along with the other statutory factors, in reaching its conclusion. The court did not find that the children had a bond with father, as father asserts, and the court's conclusion is amply supported by the children's testimony and other evidence. Even if it had found a bond, we have made clear that "[p]ublic policy . . . does not dictate that the parent-child bond be maintained regardless of the cost to the child." In re B.M., 165 Vt. at 342 (quotation omitted). The court concluded that that the children needed permanency and that father could not parent them within a reasonable time as measured from their perspective. The children had been in DCF custody for more than three years. While father believes that his rights should not have been terminated, his belief

4

alone cannot make out a case for abuse of discretion. The court's decision is supported by the record. See <u>Meyncke v. Meyncke</u>, 2009 VT 84, ¶ 15, 186 Vt. 571 (mem.) (explaining that arguments which amount to nothing more than disagreement with court's reasoning and conclusion do not make out case for abuse of discretion). There was no error.

<u>Affirmed</u>.

BY THE COURT:

 

 

_____
Harold E. Eaton, Jr., Associate Justice

 

_____
Christina E. Nolan, Associate Justice

 

_____
Michael P. Drescher, Associate Justice